**Shirley E. BRYANT, Plaintiff,**

v.

**BEGIN MANAGE PROGRAM, Defendant.**

**No. CIV.A.CV–00–6163(DGT).**

United States District Court, E.D. New York.

Aug. 26, 2003.

Cathleen Giannetta, Landman, Cosri, Ballaine & Ford, P.C., New York, NY, for Defendant.

W. Randolph Kraft, Law Offices of W. Randolph Kraft, Esq., Brookly, NY, for Plaintiff.

Shirley E. Bryant, Brooklyn, NY, pro se.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

Plaintiff Shirley E. Bryant ("Bryant") brings this employment discrimination and retaliation action against her former employer, defendant Research Foundation of State University of New York ("Research Foundation"), which administered the Brooklyn BEGIN Management Program ("BEGIN"). Bryant, who is black, alleges that her employment was terminated and that she was denied a transfer by her black supervisor because Bryant was not sufficiently "Afrocentric" and because of Bryant's lighter skin color. She also claims that she was terminated in retaliation for her complaining about being discriminated against, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). Bryant initially commenced this action *pro se*, but has since obtained counsel. Research Foundation now moves for summary judgment.[1]

## Background

The following is either undisputed or is presented in the light most favorable to Bryant. The BEGIN program is a federally mandated program that helps welfare recipients return to the workforce. (Def. Research Foundation's Loc. Civ. R. 56.1 Stmt. Mat. Facts ("Def.'s Stmt.") ¶ 1 n. 1.) Participants who engaged in this program received public assistance and were required to attend classes and engage in program activities for 35 hours each week. (*Id.* ¶¶ 1, 7.) Prior to January 3, 2000, the program was run by the City University of New York ("CUNY"). (*Id.* ¶ 1.) On January 3, 2000, CUNY ceased administering the BEGIN program, and Research Foundation took over the program. (*Id.*)

Bryant, a black female, was hired in August 1999 by CUNY as an Orientation and Assessment ("O & A") Facilitator for the BEGIN Workstudy program. (Bryant 8/29/01 Dep. at 99.[2]) Bryant's job responsibilities included providing students with program policy, conducting testing and assessment, facilitating workshops, working with the staff on classroom assignments, and, if needed, referring students for counseling. (Def.'s Stmt. ¶ 6.)

1. The task of parsing out the disputed facts of this case was not made any easier by the belated and nebulous submissions by plaintiff's counsel. Other than a one-page statement of material facts (much of which was copied verbatim from defendant's Local Rule 56.1 statement of material facts), plaintiff's counsel has failed to submit a concise and coherent narrative of plaintiff's version of events. Instead, it was necessary to rely on the hundreds of pages of plaintiff's deposition testimony to distill plaintiff's factual claims and what admissible evidence she has offered to support those claims. Although plaintiff is represented by counsel, her pleadings are accorded the "liberal construction generally afforded to pro se litigants" because her "original" pleadings were filed pro se. *Brodie v. New York City Transit Auth.*, 1998 WL 599710, at *5 & n.3 (S.D.N.Y. Sept. 10, 1998). Moreover, the docket in this case reflects that because of counsel's unreliability, plaintiff was obligated at times to continue to represent herself even after retaining counsel.

2. Bryant's deposition took place over three days, August 29, 2001, October 3, 2001, and October 8, 2001.

On January 3, Research Foundation became Bryant's employer when it took over the program. (*Id.* ¶ 1.) With the change in management, Bryant's prior supervisors were replaced by Iesha Sekou ("Sekou"), the Program Director, and Deborah Nelson ("Nelson"), the Educational Coordinating Assistant-both of whom are black females. (Def.'s Stmt. ¶ 2; Declaration of Rebecca W. Embry ("Embry Dec."), Ex. 13; Bryant 8/29/01 Dep. at 106.) The racial makeup of the program's other employees is as follows: Of the five teachers, two were white males (one of whom left on March 24, 2000), one was a Filipino female, one was a black male and one was an Hispanic male; Bryant was the only black female teacher. (Embry Dec., Ex. 13; Bryant 8/29/01 Dep. at 103–05.) Of the support staff, all of whom were female, two were black, one was Hispanic and one was white. (Embry Dec., Ex. 13; Bryant 8/29/01 Dep. at 103–05.)

During the period of transition, Bryant sought to transfer to a "coordinating position at one of the welfare centers," but was unsuccessful because that position was already filled. (Bryant 10/03/01 Dep. at 45–46.) Therefore, Bryant continued her employment at the BEGIN program despite the change in management, and her continued employment was confirmed by Research Foundation in a letter dated January 19, 2000. (Embry Dec., Ex. 6.) The letter provided that she is an at-will employee subject to Research Foundations policies and the availability of funds. (*Id.*) The stated term of her employment was March 31, 2000. (*Id.*)

The dress code at the BEGIN program allowed for casual attire during "dress down" days when students were not in attendance. (Bryant 10/03/01 Dep. at 41–42.) Sekou regularly dressed in what Bryant's describes as an "Afrocentric" attire, and routinely "kept her hair wrapped in an African hair dress." (*Id.* at 27–28, 43.) Bryant described Afrocentric attire as "exemplified" by Sekou, "the African hair dress, the African clothing." (Bryant 10/03/01 Dep. at 39.) Bryant's other supervisor, Nelson, did not wear "Afrocentric" attire. (Bryant 10/08/01 Dep. at 154–55.) Bryant, however, regularly wore a business suit even when not required. (Bryant 10/03/01 Dep. at 38–39.) Bryant also had short, curly blond hair, which was dyed from a natural color of brown to blond. (*Id.* at 27.) Among the employees working at the BEGIN program, only Sekou and Warren Burns[3]—a black male whom Sekou hired as a teacher-wore Afrocentric attire. (Bryant 10/08/01 Dep. at 154.)

Beginning in January 2000 through March 2000, Sekou derided Bryant for her choice of attire and the fact that she dyed her hair blond. (*Id.* at 141–45.) "[T]hree or four times," while on the elevator, Sekou whispered to Nelson within Bryant's earshot about Bryant's hair and "snicker[ed]." (*Id.* at 144–45.) In one encounter, Sekou, referring to Bryant's blond hair, called her a "want to be" which Bryant claims is "a common phrase in the black community" referring to someone "want[ing] to be white." (Bryant 10/03/01 Dep. at 26.) In another encounter, Sekou asked Bryant why she dyed her hair, and told Bryant that the chemicals in the dye would damage her hair. (Bryant 10/08/01 Dep. at 142.) In March 2000, Bryant overheard Sekou telling Nelson, as Bryant walked into Sekou's office, "[h]ere comes the wannabe." (*Id.* at 160.) Sekou also told Bryant that there is no need for her to wear a suit, and that Bryant "should dress

---

**3.** Mr. Burns was known at the BEGIN program as "Sedou." (Bryant 10/08/01 Dep. at 154.)

like me," pointing to herself (Sekou) while wearing what Bryant characterized an Afrocentric attire. (*Id.* at 210.)

Bryant also claims that Sekou excluded her from staff meetings by scheduling them when Bryant had classes scheduled. (Bryant 10/03/01 Dep. at 35–36.) The meetings were usually held on Fridays when participants were out on work assignments. (*Id.*) However, because Bryant worked with the participants in the orientation process who did not yet have work assignments, she had classes scheduled and could not attend the meetings. (*Id.*) Sekou told Bryant to clear her Friday schedule so that she could attend. (*Id.*) Bryant spoke with Gary Smith, the HRA Supervisor, in an attempt to reschedule her classes so that she could attend. (*Id.* at 36.) However, "each time [Bryant and Smith] went to [Sekou's] office she took a telephone call, kept [them] waiting 20, 30 minutes and [they] were unable to." (*Id.* at 36–37.) At some point, Sekou stopped informing Bryant of the meetings entirely. (*Id.*)

Sometime in late February or early March, Bryant interviewed with Yvonne Bruce ("Bruce"), the Program Coordinator for the Brooklyn BEGIN Internship Program, in an effort to transfer into a different department at the BEGIN program. (*Id.* at 48.) At the end of the interview, Bruce called the Director of Personnel, Jon Ho ("Ho")—in the presence of Bryant-and told him that "she was satisfied," and that Bruce "wanted [Bryant] to come on board as soon as possible." (*Id.*) However, Bryant's transfer was delayed because a replacement for Bryant had not yet been arranged. (*Id.*)

To comply with the federal mandate, students in orientation were typically not released before 4:30 or 5:00 p.m. (*Id.* at 52.) However, on March 16, 2000, Bryant released her students prior to the scheduled student release time. (*Id.*) In a mem-

orandum to Bryant, dated March 16, 2000, Sekou wrote that "today you dismissed all students a half-day [sic] without permission from me even though[ ] you were told under no circumstances should this happen.... Any future action of this manner can lead to your dismissal." (Embry Dec., Ex. 8.) However, Bryant denies ever receiving that memorandum and claims that Sekou had never even discussed the issue with her before March 16, 2000. (Bryant 10/08/01 Dep. at 134.) Bryant claims that the first time she saw that memorandum was after her termination, when it was submitted by Research Foundation in response to Bryant's complaint to the Equal Employment Opportunity Commission ("EEOC").

Moreover, Bryant claims that she released the students early because she was informed by Gary T. Smith, the HRA Supervisor, that students should be released early to allow the students to attend an "open school afternoon" for their school-aged children. (Bryant 10/03/01 Dep. at 53.) Bryant also claims that all teachers released their students early that day, and that no one else had been reprimanded. (*Id.*; Bryant 10/08/01 Dep. at 132–133.) Bryant claims to have never released students early on other days, unless Sekou "called a staff meeting and asked for [Bryant] to be there." (Bryant 10/03/01 Dep. at 54.)

In an email apparently sent to Ho on March 23, 2000, Sekou recommends that Bryant be terminated immediately for "Direct Insubordination" and "Disregard for Program Policy." (Embry Dec., Ex. 11.) Sekou claimed that since January 3, 2000, Bryant failed to attend mandatory staff meetings and "[f]ailed to adjust [the] schedule to accommodate Friday Staff meetings." (*Id.*) She also claimed that Bryant changed the orientation schedule without supervisory permission, which

caused confusion among new students. (*Id.*) Finally, she wrote that on March 14, 2000,[4] Bryant released students early "[d]isregarding the mandated 9 to 5 p.m." (*Id.*)

On March 24, 2000, Bryant missed another staff meeting, of which she was not informed. (Bryant 10/03/01 Dep. at 39.) However, Bryant's assistant, Maria Romero did attend and related to Bryant that at the meeting, Sekou introduced a woman, Shirley Jones ("Jones"), as Bryant's replacement.[5] (*Id.*) Bryant later saw Jones and described her as "a dark skinned woman with [ ] the dreadlock hair, with the Afrocentric dress, the African dress." (*Id.*)

Bryant then called Ho later that day to inquire on the status of her transfer request. (*Id.* at 30.) Ho asked her why she wanted to transfer. (*Id.* at 30–31.) Bryant then related to Ho her difficulties with Sekou:

> I felt Iesha Sekou was discriminating against me because of her treatment against me. I told him that I heard her make several comments about the color of my hair, my style of dress and that she had begun to exclude me in staff meetings, and that although the other staff members were given evaluations, I wasn't.

(*Id.* at 30.) Bryant also related that Sekou called her a "wannabe." (Bryant 10/08/01 Dep. at 197–98.) This was the first time that Bryant contacted Ho regarding allegations of discrimination. (Bryant 10/03/01 Dep. at 31.)

In an evaluation form dated March 31, 2000 that is unsigned—though apparently authored by Sekou—Sekou is critical of Bryant's performance. (Embry Dec., Ex. 10.) Sekou writes that Bryant was asked to update the O & A materials, which had not been done. (*Id.*) The evaluation form also states that "Bryant refuses to follow instructions and cannot take constructive criticism[, and that o]n more than one occasion [she] has been insubordinate and disrespectful." (*Id.*) The evaluation form went on to request that Bryant be terminated. (*Id.*)

The insubordination charge stemmed, at least in part, from an incident at which, Bryant turned her back walked away from Sekou while Sekou was still talking to her. (Def.'s Stmt. ¶ 14.) Bryant, however, claimed that she walked away because she thought that the conversation was over and that Bryant apologized to Sekou the next day when Sekou reproached her about the incident. (Bryant 10/03/01 Dep. at 56–57.) Research Foundation also challenges Bryant's assertion that she was not informed of the staff meetings, claiming that, in fact, it was Bryant who did not arrange her schedule in manner that would allow her to participate in the staff meetings. (Def.'s Stmt. ¶ 18.)

Bryant faxed a letter to Ho on the morning of March 31, 2000, inquiring about her transfer. In the fax, Bryant stated that it was becoming difficult to continue working under Sekou. (Bryant 10/03/01 Dep. at 30.) However, Bryant did not mention in the fax why it was difficult to work with Sekou nor did she specifically

---

**4.** This apparently refers to another instance, excluding the March 16, 2000 incident, where Bryant released her students early. Bryant may have been referring to March 14, 2000—which fell on a Friday—as one of the days that she released students early in order to attend a staff meeting. (Bryant 10/03/01 Dep. at 53.)

**5.** Research Foundation claims that Bryant's ultimate replacement, beginning July 31, 2000, was a black woman named Beloved Reese. (Aff. of Georgia Salley.) Research Foundation, however, does not deny that Jones was the initial replacement during the period between March 31 and July 31, 2000.

allege that she was being discriminated against. Later that same day, Sekou handed Bryant a termination memorandum effective immediately. (*Id.* at 33–33.)

As a result of the termination, the transfer that had otherwise been approved could not be consummated because Bryant had already been terminated. (Bryant 10/08/01 Dep. at 192–93.) Byrant then filed a complaint with the EEOC alleging discrimination based on plaintiff's race under Title VII. In her complaint to the EEOC, Bryant claimed that she was discriminated against because of her race. However, Bryant did not allege the specific facts underlying her claim, such as the allegation that Sekou called her a "wannabe." The complaint also did not refer to any incidents relating to Bryant's manner of dress, hairstyle or lack of Afrocentric attire. Bryant also did not allege retaliation-omitting the conversation she had with Ho about the discrimination, and failing to mark the retaliation checkbox. The EEOC issued a Dismissal/Notice of Right to Sue on September 13, 2000. Thereafter, this action was timely filed.

## Discussion

Summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). On a motion for summary judgment, the court must consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). "Confronted with a properly supported summary judgment motion, a plaintiff must come forward with evidence sufficient to allow a reasonable jury to find in his favor." *Lizardo v. Denny's Inc.*, 270 F.3d 94, 101 (2d Cir. 2001). In making this determination, all

factual inferences must be drawn in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). However, "conclusory statements, conjecture, or speculation" by the non-moving party will not defeat the motion. *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996).

■ "An employment discrimination plaintiff faced with a properly supported summary judgment motion 'must do more than simply show there is some metaphysical doubt as to the material facts.'" *Brown v. Henderson,* 257 F.3d 246, 252 (2d Cir.2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). In a discrimination case, the court must examine "the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Schnabel v. Abramson,* 232 F.3d 83, 90 (2d Cir. 2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000)).

### (1)

### Race Discrimination

Bryant claims that Research Foundation discriminated against her in violation of Title VII, which makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such indi-

vidual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1); *see also Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 446 (2d Cir.1999).

■ Employment discrimination claims under Title VII follow the familiar three-step burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824 (establishing framework in Title VII discrimination case). *McDonnell Douglas* and its progeny have "established an allocation of the burden of production and an order for the presentation of proof in ... discriminatory-treatment cases." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2746, 125 L.Ed.2d 407 (1993). First, the plaintiff must establish by a preponderance of the evidence a *prima facie* case of discrimination. *See St. Mary's Honor Ctr.*, 509 U.S. at 506, 113 S.Ct. at 2746–47. If the plaintiff meets this burden, a presumption is created that the employer unlawfully discriminated against the employee. *See id.* at 506, 113 S.Ct. at 2747. The burden then shifts to the defendant to articulate evidence that the adverse employment action was taken for a legitimate, non-discriminatory reason. *See id.* at 506–07, 113 S.Ct. at 2747; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). If this is accomplished, the presumption of discrimination "completely 'drops out of the picture.'" *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir.2000) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 510–11, 113 S.Ct. at 2749). The burden of persuasion returns to the plaintiff, and "the employer will be entitled to summary judgment ... unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James*, 233 F.3d at 154 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 510–11, 113 S.Ct. at 2749); *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1336 (2d Cir.1997) (en banc). That is, at the third stage, the plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.

### (2)

### Prima Facie Case

■ To establish that her termination and denial of overtime were discriminatory, Bryant must first establish a *prima facie* case by showing that: (1) she belongs to a protected group; (2) she was qualified for the job; (3) she suffered adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824 (establishing requirements for *prima facie* case of discrimination under Title VII). These requirements for establishing a *prima facie* case are "minimal." *St. Mary's Honor Ctr.*, 509 U.S. at 506, 113 S.Ct. at 2747; *see also Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 380 (2001).

Research Foundation argues that to the extent that Bryant's claim rests on discrimination reflected in the comments made about her hair and manner of dress, her claims should be dismissed because they are not within a class of discrimination prohibited by Title VII. To support that argument, Research Foundation relies on several cases upholding employment dress and grooming codes as well as prohibited hair styles. *See Eatman v. United Parcel Serv.*, 194 F.Supp.2d 256 (S.D.N.Y. 2002) (holding that race-neutral company policy prohibiting "unconventional" hairstyles are not discriminatory and quoting *Rogers v. Am. Airlines, Inc.*, 527 F.Supp. 229, 232 (S.D.N.Y.1981) ("An all-braided hair style is an 'easily changed characteris-

tic,' and, even if socioculturally associated with a particular race or nationality, is not an impermissible basis for distinctions in the application of employment practices by an employer.")); *Sanders v. Mount Sinai Medical Center.*, 1999 WL 1029734, at *6–7 (S.D.N.Y. Nov.10, 1999).

■ However, these cases are inapposite. They only apply where the dress code is applied without any impermissible discrimination. *See Hollins v. Atl. Co.*, 188 F.3d 652, 661 (6th Cir.1999) (finding that unwritten policy that hairstyles not be "eyecatching" was discriminatory where only applied to black female employee). Here, Bryant is claiming that she was treated differently because she was black—that she suffered an adverse employment action because, as a black woman, she was obligated to dress in a particular manner, despite the fact that the dress code was flexible as applied to others. Additionally, the fact that Bryant's supervisor was black does not place Bryant's race discrimination claim outside the scope of Title VII. *See Bland v. New York*, 2003 WL 1798473 (E.D.N.Y. Mar.7, 2003); *Durling v. Uddo and Assocs.*, 1993 WL 33645, at *2 n. 6 (S.D.N.Y. Feb.4, 1993) ("Nothing precludes an individual from discriminating against a group of which he is also a member.") (citations omitted). According-

ly, to the extent that any adverse employment action arose out of Sekou's views of how a black employee should dress (or not dress), the resulting adverse employment action would be actionable under Title VII.

■ As such, Bryant belongs to a protected class. It is undisputed that Bryant suffered an adverse employment action, specifically, her exclusion from staff meetings[6] and ultimate termination. Bryant has also made a *prima facie* showing that she was qualified for the job, given that, at the same time that she was fired, Bruce, the program coordinator, of another department at BEGIN, was willing to have Bryant come work for her.

As to whether the termination occurred under circumstances giving rise to an inference of discrimination, Bryant has submitted evidence of racially-tainted animosity by Sekou, the person who advocated that Bryant be terminated. The comments by Sekou that Bryant dress "like me" (while pointing at her "Afrocentric" dress) and the disparaging of Bryant's dyed, blond hair do not, by themselves, give rise to an inference of discrimination. However, coupled with the comments of Bryant being a "wannabe,"[7] Bryant has presented a *prima facie* of a prohibited animus giving rise to an inference of discrimination.[8]

6. Exclusion from staff meetings is usually not in itself an adverse employment action. *See Spencer v. City Univ. of New York*, 932 F.Supp. 540, 549 (S.D.N.Y.1996) (finding that exclusion from departmental meetings not adverse action where plaintiff had no stake in the meeting discussions). Here, however, Bryant's termination is intertwined with her exclusion from the meetings because her termination resulted, in part, on her failure to attend these meetings.

7. In the absence of any contradicting evidence, Bryant's claim that a "wannabe" is understood "in the black community" as referring to someone "want[ing] to be white" is accepted for the purposes of this motion.

(Bryant 10/03/01 Dep. at 26.) Similarly, although the term "wannabe" is perhaps widely used without any negative racial connotations, plaintiff's unchallenged claim that it can be reasonably interpreted so in the context alleged by Bryant is accepted.

8. Research Foundation argues that *Sanders v. Mount Sinai Medical Center.*, 1999 WL 1029734, at *6–7 (S.D.N.Y. Nov.10, 1999), stands for the proposition that remarks about clothing and grooming even when racially animated cannot support a Title VII claim. In *Sanders*, the court dismissed a black employee's Title VII claim, despite her allegations that her black supervisor, who was born in Jamaica, was overheard to say that black

### (3)

### Legitimate Non–Discriminatory Reason for Termination

■ Under the *McDonnell Douglas* framework, the Research Foundation is charged with the burden of articulating a legitimate, non-discriminatory reason for terminating Bryant. This burden, however, is not demanding; Research Foundation only need to offer "an explanation for the employment decision." *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 446 (2d Cir. 1999). In addition, although at this stage the burden of production is on the defendant, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

Defendant has met this burden. In sum, it claims that Bryant was terminated because she released students early in violation of the federal mandate, acted in an insubordinate manner and failed to arrange her schedule in a manner that would allow her to attend necessary staff meetings. Indeed, Research Foundation has submitted evidence consistent with its claim, in the form of a contemporaneous, unflattering evaluation of Bryant and Sekou's email setting forth the reasons why she recommended that Bryant be terminated. Moreover, Bryant concedes that she released students early on at least one (and perhaps another) occasion. Accordingly, the defendant have articulated a legitimate, non-discriminatory reasons for their actions.

### (4)

### Pretext for Discrimination

As Research Foundation has met its burden of production, the presumption of discrimination completely drops out of the picture. Research Foundation is now entitled to summary judgment unless Bryant can carry her burden of persuasion and point to evidence that reasonably supports a finding of prohibited discrimination.

■ There are two components of the plaintiff's proof at this stage. First, the plaintiff must demonstrate that there is a genuine issue of material fact regarding the employer's claimed non-discriminatory reason for its action. That is, the plaintiff must demonstrate that the proffered reason is pretext. Second, the plaintiff must establish an issue of fact as to whether the defendant engaged in intentional discrimination. "[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr.,* 509 U.S. at 515, 113 S.Ct. at 2752 (emphasis in original); *see also Bickerstaff,* 196 F.3d at 446 ("The plaintiff's opportunity to demonstrate that the employer's proffered reason was false now merges with her ultimate

Americans are "lazy[,]" and despite allegations that the supervisor called her "Afrocentric" hairstyle "nappy." *Id.* To the extent that *Sanders* can be read to support the position that even race-based comments regarding hair and clothing cannot support a Title VII claim, I believe that this would be an incorrect statement of the law. *See Hollins,* 188 F.3d at 661. In fact, however, the court in *Sanders* rested on the finding that the comments about the hair were not race-based. *See Sanders,* 1999 WL 1029734, at *6 (finding that comments about the plaintiff's hair did not "create an inference that [the supervisor] was motivated by discriminatory intent towards plaintiff"). The court in *Sanders* also discounted the allegation that the supervisor was overheard to say that blacks are "lazy" because the plaintiff was "unable to identify who the individual was who overheard it." *Id.* Finally, in dismissing the case, the court found that the termination was not discriminatory because the plaintiff, who was a nurse, was responsible for several lapses in medical care including one that resulted in third-degree burns to a patient's chest. *See id.* at *2.

burden to persuade the trier of fact that she has been the victim of intentional discrimination."). However, "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive." *Reeves*, 530 U.S. at 147, 120 S.Ct. at 2108 (citation omitted).

■ Here, Bryant has challenged the proffered reason for her termination as merely a pretext. Bryant claims that Sekou's March 16, 2000 memorandum regarding releasing the students early was never handed to Bryant. Bryant also argues that all the teachers had released their students early that day and that only Bryant was reprimanded. Bryant also claims that the charge that she failed to attend staff meetings was a mere pretext because she was deliberately excluded from these meetings. Although this fact, as well as many of Bryant's allegations, are disputed by Research Foundation, these questions of credibility and fact are for the jury to decide. Given that Bryant would have personal knowledge of these events, her testimony is sufficient evidence of pretext for her claim to survive at this stage.

Of course, a pretextual firing is not always indicative of unlawful discrimination. However, "plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148, 120 S.Ct. at 2109. Moreover, as mentioned earlier, Bryant has provided independent evidence that the supervisor who had recommended her termination was the one who exhibited the prohibited animosity. Accordingly, Bryant has presented sufficient evidence to allow a reasonable factfinder to conclude that her termination was the result of a discrimination prohibited by Title VII.

### (5)

### Retaliation

■ Title VII provides a cause of action for an employee who is retaliated against by his employer for filing a discrimination charge or for otherwise opposing discriminatory employment practices.[9] Retaliation claims under each of these provisions, like discrimination claims, are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Coffey v. Dobbs Int'l Servs., Inc.*, 170 F.3d 323, 326 (2d Cir.1999) (applying *McDonnell Douglas* to retaliation claims). Thus, to state a *prima facie* case of retaliation, plaintiff must demonstrate that: 1) she engaged in protected activity; 2) defendant was aware of her participation in the protected activity; 3) defendant took an adverse employment action against her; and 4) a causal connection existed between the protected activity and the adverse employment action. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir.2000).

■ Bryant has asserted that she was terminated in retaliation for complaining about Sekou's discriminatory behavior. It has already been established that Bryant belongs to a protected group, and clearly Bryant's complaining about discrimination to the Director of Personnel is protected activity. Bryant's complaint is a protected activity even if the underlying claim would be unsuccessful. *See Alvarez v. City of New York*, 31 F.Supp.2d 334, 344

---

9. Title VII provides that it is unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).

(S.D.N.Y.1998) ("[A]n employee engages in protected activity, and is therefore protected from retaliation, as long as there is a good faith, reasonable belief that the employer had violated the law.") (internal quotation marks omitted). Finally, the termination of Bryant's employment clearly constitutes an adverse employment action.

 Bryant argues that the close temporal proximity between her termination and her complaining to Ho establishes the necessary causal connection. *See Treglia v. Town of Manlius,* 313 F.3d 713, 720 (2d Cir.2002) ("[A] close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation."). However, whether a close temporal relationship is indicative of retaliation depends, of course, on the sequence of events: the retaliation must occur after the protected activity. *See McNair v. New York City Health & Hosp. Co.,* 160 F.Supp.2d 601 (S.D.N.Y.2001) (dismissing retaliation claim where "most of the retaliatory conduct alleged by [the plaintiff] occurred *before* the date of her protected activity"). Here, Bryant admits that the first time she ever complained to anyone about the alleged discrimination was on March 24, 2000—after Sekou sent an email to Ho recommending that Bryant be terminated. Furthermore, Bryant only complained to Ho after she discovered that Sekou had announced that Jones was to replace Bryant. Indeed, Bryant claims that it was the announcement regarding a replacement that provoked her to call Ho and complain about the discrimination. Accordingly, Bryant has failed to present even a *prima facie* case of retaliation.

### (6)

### Exhaustion

Research Foundation also argues that Bryant's factual and legal claims of discrimination were not properly raised in the EEOC complaint. Indeed, in the EEOC complaint, Bryant claimed race discrimination and focused primarily on the adverse employment action (her termination, exclusion from meetings, denial of transfer, etc.). She did not relate the specific facts (*e.g.,* being called a "wannabe") that she relies on here to prove that these adverse employment action were motivated by race. The EEOC complaint also failed to make any legal or factual allegations of retaliation.

 "Generally, a plaintiff who fails to file a timely charge with the EEOC is barred from asserting a claim of discrimination in federal court." *Angotti v. Kenyon & Kenyon,* 929 F.Supp. 651, 654 (S.D.N.Y.1996) (citations omitted). To hear a Title VII claim, that claim must have been included in the EEOC charge or be reasonable related to the allegations in the charge. *See O'Neal v. State University of New York Health Science Cent.,* 2003 WL 1524664, at *3 (E.D.N.Y. Mar.24, 2003). "A claim is reasonably related 'where the conduct complained of would fall within the scope of the administrative investigation which can reasonably be expected to grow out of the charge of discrimination.'" *Id.* (quoting *Butts,* 990 F.2d at 1402); *see also Francis v. City of New York,* 235 F.3d 763, 766 n. 1 (2d Cir.2000) (interpreting *Butts* as holding that "pre-charge conduct had been administratively exhausted by virtue of the fact that they fell within the scope of an investigation reasonably responsive to the charge").

 Here, Bryant's EEOC narrative perhaps did not delve into the particulars of the incidents supporting her allegations—such as being called a "wannabe." However, the allegations that she does make here are clearly within the scope of the administrative investigation which can

reasonably be expected to grow out of the charge of discrimination. This is particularly the case where, as here, all the offending individuals and the timeline of events are indicated in the EEOC complaint. Accordingly, Bryant properly exhausted her administrative remedies with respect to her claim of race discrimination.

The same is true for Bryant's retaliation claims. Although in the complaint, Bryant neither alleged retaliation nor stated the specific fact that would indicate such a claim—namely, her conversation with Ho where she complained about the discrimination—the retaliation claim is closely related to her discrimination claim. A retaliation claim is permitted to proceed even if the retaliation claim was not part of the EEOC complaint where "an EEOC investigation would be reasonably expected to include the plaintiff's allegation of retaliation." *Angotti*, 929 F.Supp. at 660. However, as explained above, Bryant's retaliation claim, nonetheless, fails on the merits.

### Conclusion

Accordingly, Research Foundation's motion for summary judgment is denied as to the race discrimination claim and granted as to the retaliation claim.

SO ORDERED.