**Dr. Herbert Harry SPENCER, Plaintiff,**

v.

**CITY UNIVERSITY OF NEW YORK/COLLEGE OF STATEN ISLAND, Defendant.**

**No. 94 Civ. 4477(JGK).**

United States District Court, S.D. New York.

June 26, 1996.

Alan Serrins, Dienst & Serrins, New York City, for plaintiff.

Lisa R. Dell, Robert W. Ottinger, Jr., Assistant Attorneys General for the State of New York, New York City, for defendant.

## OPINION AND ORDER

KOELTL, District Judge:

The plaintiff, Dr. Herbert Harry Spencer, brought this action against the College of Staten Island of The City University of New York under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., alleging discrimination against him because of his religion. The Court conducted a four-day bench trial from May 20 to 23, 1996.

After hearing the evidence and evaluating the testimony, the exhibits received in evidence, and the credibility of the witnesses, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52(a).

## I. FINDINGS OF FACT

1. The plaintiff, Dr. Herbert Harry Spencer ("Dr. Spencer"), is Jewish. Dr. Spencer received a Bachelor's degree in engineering from the University of London, a Master's degree in structures from the Polytechnic Institute of Brooklyn, and a Ph.D. degree in structural stability from University College, University of London. Dr. Spencer has held teaching positions at the New Jersey Institute of Technology, Rutgers University, Louisiana State University, University of Pittsburgh, University of Southern California, San Diego State College, and Hatfield Polytechnic in England. He received tenure only at Hatfield Polytechnic. Dr. Spencer also has experience working in industry as a consultant and scientist. (Pl.'s Exh. 1.)

2. Dr. Spencer was appointed as a substitute associate professor in the Department of Applied Sciences (the "Department") of the defendant, College of State Island ("COSI") of The City University of New York, from September 1, 1984 through August 31, 1985. This was not a tenure-track position.

3. Effective September 1, 1985, Dr. Spencer was appointed associate professor of mechanical engineering in the Department on a nonsubstitute basis. (Def.'s Exh. J.) Prof. Norbert Chencinski, who was chair of the Department, and Prof. Alfred Levine credibly testified that Dr. Spencer was selected for this nonsubstitute tenure-track position because the Department was convinced that Dr. Spencer would be able to set up an experimental laboratory for solid mechanics with the limited resources of COSI. The Department also expected that once he set up the laboratory he would use it to conduct research that would result in publications.

4. Dr. Spencer was recommended by the Department for reappointment for the 1986–87 academic year, the 1987–88 academic year, and the 1988–89 academic year.

5. In the 1988–89 academic year, Professor Panngiotis Razelos, the senior mechanical engineer for the Department, was invited to attend the meetings of the Department Appointments Committee (the "Committee") in his role as engineering coordinator. The position of engineering coordinator was an appointed position that involved such responsibilities as monitoring the engineering faculty and receiving student complaints about engineering faculty and classes. The engineering

coordinator did not, however, have the same responsibilities or authority as the chair of the Department.

6. On October 11, 1988, the Department voted unanimously by secret ballot not to recommend Dr. Spencer for reappointment for the 1989–90 academic year.

7. The Department Appointments Committee that voted to recommend Dr. Spencer for the 1988–89 academic year was composed of the same members who unanimously voted not to recommend his reappointment for the 1989–90 academic year. The voting members of the Committee were professors in COSI's applied engineering department: Andrei Weiszmann, Norbert Chencinski, Alfred Levine, Erlan Feria, and Prof. O'Hane. Prof. Razelos was present at the meeting as engineering coordinator, but he was not a voting member of the Committee. The Court heard testimony from three Committee members: Profs. Chencinski, Weiszmann, and Levine.

8. Profs. Weiszmann and Levine are Jewish. Prof. Weiszmann is also a Holocaust survivor who testified that he survived internment at a concentration camp for six months and at a Hungarian forced labor camp for seven months, and that he lost 28 family members during the Holocaust.

9. The Committee reviewed Dr. Spencer's file, which included his curriculum vitae, publications, student evaluations, and peer evaluations.

10. During the Committee meeting held in October 1988 to discuss the reappointment of Dr. Spencer, Razelos made a remark to the effect that he would be unable to work with someone who wore a Star of David around his neck.

11. Immediately after Prof. Razelos made this comment, Profs. Chencinski and Weiszmann told Razelos that his comment was inappropriate and that what Dr. Spencer wore around his neck was irrelevant to the Committee's decision whether to recommend him for a fourth reappointment.

12. Profs. Chencinski, Weiszmann, and Levine credibly testified that this comment did not affect their view of Dr. Spencer's academic performance at all and had no af-

fect on the way they voted. Prof. Weiszmann said he was personally offended by Prof. Razelos's "ugly" comment.

13. In addition, the members of the Committee did not rely solely on Prof. Razelos's evaluation of Dr. Spencer's performance in determining whether to vote to recommend Dr. Spencer for a fourth reappointment. All three professors testified credibly that based on the formal student evaluations and the more informal discussions they had with students, they believed that Dr. Spencer was a weak teacher, and that based on their experience in scientific research and in reviewing professors for reappointment and tenure, Dr. Spencer had not shown the requisite dedication and seriousness to the development of an experimental solid mechanics laboratory. Prof. Weiszmann also testified that the Committee members had already begun discussing Dr. Spencer's achievements before Prof. Razelos came to the meeting, and that this discussion of Dr. Spencer was mostly negative. While Dr. Spencer had been approved for reappointment before, the review became more searching as the time for considering Dr. Spencer for tenure drew closer. The Committee voted unanimously by secret ballot not to recommend Dr. Spencer for reappointment.

14. Prof. Weiszmann subsequently told Dr. Spencer about Prof. Razelos's remark. Prof. Weiszmann also explained to Dr. Spencer that he had voted against him.

15. On November 9, 1988, Dr. Spencer appealed the Department Appointments Committee's negative recommendation to the College Personnel and Budget Committee. The president of COSI Edmond Volpe chaired this committee. Prof. Chencinski, who was the chair of the COSI Applied Sciences Department, was a voting member of this committee.

16. Barry Bressler, the vice president for academic affairs at COSI, told the members of the Personnel and Budget Committee about the inappropriate remark Razelos made at the Department Appointments Committee meeting. Bressler also told the Personnel and Budget Committee that Razelos had been castigated by the Department Ap-

pointments Committee for making the remark, and that this comment was not at all relevant to the appointment process.

17. The Personnel and Budget Committee had available for its review all of the records concerning Dr. Spencer, including the raw student evaluations. In addition, Dr. Spencer made a presentation to this committee.

18. Prof. Chencinski did not make a presentation to the Personnel and Budget Committee, but other members of the Personnel and Budget Committee asked Prof. Chencinski questions about Dr. Spencer's teaching and development of a solid mechanics laboratory.

19. The College Personnel and Budget Committee unanimously voted against recommending Dr. Spencer's fourth reappointment. Prof. Chencinski voted against reappointment.

20. The President of COSI reviews all reappointment recommendations, whether positive or negative. Then–President Volpe conducted an independent review of the reappointment of Dr. Spencer.

21. President Volpe was aware that the anti-semitic remark had been made at the Department Appointments Committee meeting. The fact that this remark had been made concerned President Volpe, but he was satisfied by Bressler's and the Personnel and Budget Committee's assurances that they considered this comment improper and serious but that it was not one of their considerations in the appointment process. President Volpe credibly testified that if anything the fact that an anti-semitic comment had been made at the Department Appointments Committee meeting made him *more* hesitant to recommend that Dr. Spencer not be reappointed.

22. President Volpe consulted with Dr. Barry Bressler, the vice president of academic affairs for COSI, to make a decision regarding the reappointment of Dr. Spencer. Bressler is Jewish.

23. President Volpe did not recommend Dr. Spencer's reappointment for the 1989–90 academic year to the Board of Trustees. (Def.'s Exh. Z.)

24. In a letter dated December 16, 1988, President Volpe responded to Dr. Spencer's request for a statement of reasons why President Volpe did not recommend Dr. Spencer's reappointment: "It is my judgment that you have not satisfied the professional expectations outlined for you by your department chairperson; these include laboratory development, completion of an experiment in progress, and improvement of your relationship with students." (Def's Exh. AA.)

25. The Board of Higher Education of the City of New York provides guidelines for the reappointment of instructional staff. There are four criteria for decisions to reappoint: teaching effectiveness, scholarly and professional growth, service to the institution, and service to the public. (Def.'s Exh. G at 6–7.) The guidelines provide that "[c]andidates in tenure bearing titles for the first reappointment are expected to demonstrate their potential for scholarly work and their achievement." (*Id.* at 6.)

26. Although the same general criteria are used to evaluate a candidate in tenure-track positions for the second and subsequent reappointments,

> [j]udgments on reappointments should be progressively rigorous. In the second and subsequent reappointments, a candidate should be able to demonstrate that he has realized some of his scholarly potential. Similarly, standards of acceptable performance as a teacher should be graduated to reflect the greater expectations of more experienced faculty members.

(*Id.* at 8.)

27. The Department Appointments Committee, the Personnel and Budget Committee, and President Volpe followed the criteria outlined in the Board of Education guidelines to evaluate Dr. Spencer for a fourth reappointment.

28. The Department Appointments Committee, the College Personnel and Budget Committee, and President Volpe did not recommend the reappointment of Dr. Spencer for the 1989–90 academic year because he had not demonstrated excellence in his teaching and research and because he had not

made satisfactory progress in the development of a solid mechanics research laboratory. This lack of excellence in teaching and of progress in the development of the laboratory is amply supported by the evidence. The decision not to reappoint Dr. Spencer was not made because he was Jewish.

29. Each semester students at COSI were given the opportunity to evaluate the performance of their professors. Of the 12 classes Dr. Spencer taught while he was at COSI, Dr. Spencer received an evaluation of "insufficient data" for 10 of them, a rating of "far below average" for one class he taught in 1985, and a rating of "average" for another class he taught in 1987. A rating of "insufficient data" indicates that there were not enough evaluations completed to determine a statistically meaningful rating of a professor's performance. A number of factors may cause a low response rate, including low enrollment and absenteeism. Those deciding whether to vote for the fourth reappointment of Dr. Spencer regarded such a large percentage of "insufficient data" ratings with skepticism.

30. Students informally complained to Profs. Chencinski, Levine, and Weiszmann about Dr. Spencer as a teacher. Students said that Dr. Spencer was condescending and belligerent, and that they did not want to take classes with him.

31. The professors who served on the 1987–88 Department Appointments Committee had consistently expressed serious concerns about Dr. Spencer's teaching throughout his time at COSI. *See* Def.'s Exh. A (Levine's teaching evaluation of Dr. Spencer, 11/4/85) ("Spencer should take a less belligerent attitude towards the students. . . . Spencer's teaching is adequate but there is room for significant improvement."); Def.'s Exh. C (1986 Annual Evaluation) ("One area of concern in the student evaluations received by Professor Spencer. . . . It is recommended that Professor Spencer try to upgrade his student evaluations."); Def's Exh. D (1987 Annual Evaluation) ("A serious problem is the continuing negative student opinion of Professor Spencer. This has had a deleterious effect upon our efforts to build up elective courses for the students in the me-

chanical engineering option. The student's [sic] have complained to senior faculty about Professor Spencer's attitude towards them. It is recommended that Professor Spencer try to improve his relationship with the students.")

32. Prof. Levine testified that to his knowledge Dr. Spencer was the worst candidate the Committee had ever evaluated. President Volpe testified that he has never seen a professor earn tenure with the sort of teaching record Dr. Spencer had.

33. As explained above, when Dr. Spencer was first appointed to a full-time professorship, one of his responsibilities was to build an experimental research laboratory in solid mechanics. During the years he taught at COSI, Dr. Spencer was given $40,000 dollars to develop this laboratory.

34. The members of the Department Appointments Committee were disappointed with Dr. Spencer's progress in building this laboratory. Although at trial Dr. Spencer offered several reasons why there were delays in the development of the laboratory, such as flooding in the laboratory, Profs. Chencinski, Levine, and Weiszmann testified credibly that even though the Department gave its full support to the development of this laboratory, including the investment of a substantial amount of money, they did not believe Dr. Spencer had invested the time and effort necessary to develop this facility. Furthermore, there is no evidence that Dr. Spencer ever published the results of any research conducted in this laboratory, as the Department had expected Dr. Spencer would do.

35. Pursuant to the Agreement between The City University of New York and the Professional Staff Congress/CUNY, nontenured professors were to be observed at least once during each academic semester. (Def.'s Exh. HH at 37.)

36. Prof. Levine's negative teaching evaluation of Dr. Spencer in the spring of 1989 was not inconsistent with prior formal and informal teaching evaluations of Dr. Spencer.

37. Under the Bylaws of the Trustees of COSI, once a faculty member receives notice of nonreappointment, he loses the right to

vote in the faculty of which they are members and in their respective departments. (Def.'s Exh. II at 8.1.)

38. Dr. Spencer was not included on a committee formed to respond to the concerns of ABET, an accreditation society that threatened to deny accreditation to COSI. This committee first met on October 24, 1988 and met several times thereafter. (P.'s Exh. 28.) Other professors in the Applied Sciences Department, including Profs. Chencinski and Monahan, were not invited to these committee meetings. There is no evidence that Dr. Spencer was not included on this committee as retaliation for any of his complaints.

39. After Dr. Spencer was not reappointed for a fourth time, Razelos performed an inventory of equipment in Dr. Spencer's laboratory. The purpose of this audit was to enable the Department to deploy any resources once Dr. Spencer left COSI.

40. COSI did not retaliate against Dr. Spencer because of any complaints that he made about his treatment.

## II. CONCLUSIONS OF LAW

Dr. Spencer alleges both that the defendant's decision not to grant him a fourth reappointment was discriminatorily based on his religion, and that the defendant engaged in retaliatory acts when he complained about what he perceived as religious discrimination.

### A. DISCRIMINATION

■ 1. In an employment discrimination case based on religious discrimination, the plaintiff bears the burden of proving by a preponderance of the evidence that the defendant intentionally discriminated against him because of his religion. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–12, 113 S.Ct. 2742, 2748–50, 125 L.Ed.2d 407 (1993). The plaintiff may establish a prima facie case of discrimination by proving by a preponderance of the evidence that he (1) is a member of a protected class; (2) was qualified to perform the duties required by the position; and (3) suffered an adverse employment action under circumstances giving rise to an inference of discrimination. *McDon-*

*nell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973); *Hargett v. National Westminster Bank,* 78 F.3d 836, 838 (2d Cir.1996).

■ 2. Once a plaintiff establishes a prima facie case, an inference of discrimination arises, and the burden of production shifts to the defendant to rebut the presumption of discrimination by articulating a legitimate non-discriminatory reason for the employment action. *Hicks,* 509 U.S. at 510, 113 S.Ct. at 2748–49; *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *de la Cruz v. New York City Human Resources Admin. Dep't of Social Servs.,* 82 F.3d 16, 20 (2d Cir.1996). If the defendant produces evidence of a nondiscriminatory reason for the employment action, the plaintiff has the opportunity to prove that the reasons offered by the defendant were not the true reasons for the employment action, but were a pretext for discrimination. *Hicks,* 509 U.S. at 509–10, 113 S.Ct. at 2748–49; *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825–26; *Hargett,* 78 F.3d at 838; *de la Cruz,* 82 F.3d at 20.

■ 3. Once the defendant has met its burden of producing nondiscriminatory reasons for its actions, as it has in this case, the presumption created by the prima facie case drops out of the picture, and the trier of fact must decide the ultimate question, which is whether the plaintiff has proven that the defendant intentionally discriminated against him because of his religion. *Hicks,* 509 U.S. at 510–11, 113 S.Ct. at 2748–49; *United States Postal Serv. v. Aikens,* 460 U.S. 711, 714–16, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983). The plaintiff retains the burden of persuasion to prove that the defendant intentionally discriminated against him because of his religion.

■ 4. The plaintiff is not required to prove that religion was the sole or exclusive motivation for the defendant's actions. The plaintiff need only show that religion was a motivating factor in this defendant's decision not to reappoint him. *Ostrowski v. Atlantic Mut. Ins. Co.,* 968 F.2d 171, 181–82 (2d Cir.

1992); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1185 (2d Cir.1992).

5. The defendant has successfully met its burden of production by producing evidence that its decision not to reappoint Dr. Spencer for a fourth time was based on legitimate nondiscriminatory reasons. Specifically, the defendant has shown that Dr. Spencer was not reappointed a fourth time because the Department Applications Committee, the Personnel and Budget Committee, and President Volpe believed that Dr. Spencer had not demonstrated excellence in teaching and lacked dedication to constructing an experimental laboratory in solid mechanics. I find that this evidence was credible and persuasive and that Dr. Spencer's religion was not a motivating factor in the decision not to reappoint him.

6. The plaintiff has failed to establish by a preponderance of the evidence that COSI's decision not to reappoint him was because of his religion. I find that on the contrary, based on all the evidence and my assessment of the witnesses' credibility, that the defendant's decision not to reappoint Dr. Spencer was wholly unrelated to his religion.

7. I find that COSI's proffered reasons for not reappointing the plaintiff were not pretextual but were in fact the true reasons for not reappointing him.

8. The only evidence that the plaintiff's religion played any part in the defendant's employment decision is Prof. Razelos's comment at the Department Appointments Committee meeting called to decide whether to recommend the plaintiff for a fourth reappointment. Prof. Razelos was not a voting member of the Department Appointments Committee, however, and thus the anti-semitic animus of Prof. Razelos this comment indicates does not by itself demonstrate that the defendant's decision not to reappoint the plaintiff had anything at all to do with his religion. Indeed, the three committee members who appeared at trial credibly testified that they disregarded Prof. Razelos's comment and that they in fact reprimanded Prof. Razelos for making such a comment and for even raising any issue that was unrelated to Dr. Spencer's qualifications for reappointment.

9. The fact that Prof. Razelos's evaluation of Dr. Spencer may have been tainted by Prof. Razelos's anti-semitism is not sufficient to impute a discriminatory animus to the voting members of the Committee. Those individuals who actually determined whether Dr. Spencer should be reappointed for a fourth time were not themselves motivated to vote against Dr. Spencer because of his religion, and the plaintiff does not argue that they were. Indeed, two of the members of the Department Appointments Committee were Jewish, and one of them was a concentration camp survivor who lost almost his entire family during the Holocaust. Both of these professors voted against recommending Dr. Spencer for reappointment. Furthermore, the three members of the Committee who testified at trial credibly testified that they disregarded Prof. Razelos's comment and that Dr. Spencer's religion was not at all a factor in their decision not to recommend Dr. Spencer for reappointment. Similarly, the plaintiff presented no evidence that the Personnel and Budget Committee's decision not to recommend him for reappointment was motivated at all by discriminatory animus, and the same is true for President Volpe's decision. The Personnel and Budget Committee and President Volpe were told that Prof. Razelos had made an anti-semitic comment, and they promptly disavowed its relevance to their decision regarding Dr. Spencer.

10. Nor is there any evidence that any bias by Prof. Razelos affected the ultimate vote on Dr. Spencer's reappointment. Profs. Chencinski, Levine, and Weiszmann credibly testified that when they voted against recommending Dr. Spencer for reappointment, they did so because they had made an independent judgment that he had a poor teaching record and had failed to show dedication to the creation of an experimental solid mechanics lab. For example, Prof. Levine had previously given Dr. Spencer a poor teaching evaluation in 1986, and testified that in all of his years of evaluating teachers for reappointment, Dr. Spencer was the worst one he had ever seen. All three men testified that many students had complained to them that they did not want to take classes with Dr.

Spencer and that he had a condescending and belligerent attitude towards them. All three professors stated that they were dissatisfied with Dr. Spencer's progress with the experimental solid mechanics laboratory, the development of which was the primary reason Dr. Spencer was originally hired as a full-time professor. Similarly, President Volpe testified that he never saw someone receive tenure—for which Dr. Spencer would have been considered at his fifth reappointment—with the kind of student evaluations Dr. Spencer had. The vote of the Committee was unanimous and was taken by secret ballot.

11. Prof. Razelos's negative evaluation of Dr. Spencer is amply supported by the record, which indicates that Dr. Spencer was not a strong teacher and that he failed to complete the creation of an experimental solid mechanics laboratory or to publish research conducted using this laboratory. The plaintiff spent much time at trial attempting to discredit the defendant's judgments regarding Dr. Spencer's performance in the classroom and in the development of the laboratory. The testimony of the professors is credible, however, that the standards of reappointment become more critical as a professor approaches the tenure determination and that Dr. Spencer failed to measure up to these standards. While Dr. Spencer attempted to explain away why he had not performed in ways expected of him, the Committee had the right not to accept those explanations and to look for more concrete results, particularly from a faculty member who was approaching the tenure decision. As Prof. Levine stated at trial, the Committee's role was to judge Dr. Spencer's performance, not his excuses. In sum, the plaintiff has presented absolutely no evidence that those individuals who actually decided not to recommend the plaintiff for a fourth reappointment were themselves motivated by discriminatory animus to do so or that they relied on a report that was tainted as the result of discriminatory bias.

12. Because the plaintiff has failed to prove that his religion was a motivating factor in the defendant's decision not to reappoint him, it is not necessary to undertake the *Price Waterhouse* "mixed motives" analysis. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 247, 109 S.Ct. 1775, 1788–89, 104 L.Ed.2d 268 (1989); *Hargett*, 78 F.3d at 840; *Ostrowski*, 968 F.2d at 181 ("The *Price Waterhouse* issue does not arise for the trier of fact until the plaintiff has carried the burden of persuading the trier that the forbidden animus was a motivating factor in the employment decision but has failed to persuade the trier that non-discriminatory reasons proffered by the employer were pretexts and not also motivating factors.")

## B. RETALIATION

■ 1. The plaintiff claims that the defendant retaliated against him for his opposition to what he believed to be discriminatory acts.[1]

■ 2. Section 704(a) of Title VII provides, in part, that:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). The burden-shifting analysis of retaliation claims follows the same analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973). *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1307 (2d Cir.1995). Thus, after the plaintiff establishes a prima facie case of retaliation, the

---

**1.** At trial Dr. Spencer did not allege that the defendants retaliated against him because he filed a charge with the State Division of Human Rights and the Equal Employment Opportunity Commission, apparently to avoid any adverse inferences from the fact that both agencies found no probable cause for the plaintiff's allegations.

The plaintiff only claimed that the defendants retaliated against him because he complained to COSI authorities about alleged discrimination. However, as explained below, the plaintiff has failed to establish retaliation for any protected activities.

defendant must articulate a "legitimate, non-discriminatory reason" for its actions, at which point the plaintiff has the opportunity to prove that the proffered reason is merely a pretext for discrimination. The plaintiff always bears the burden of persuasion that the defendant retaliated against the plaintiff. *Id.*

3. To establish a prima facie case of retaliation, the plaintiff must demonstrate that (1) he was engaged in an activity protected by Title VII; (2) the employer was aware of the plaintiff's participation in the protected activity; (3) the employer took adverse action against the plaintiff; and (4) a causal connection existed between the protected activity and the adverse action. *Tomka,* 66 F.3d at 1308; *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir.1993).

4. Dr. Spencer claims that the following adverse employment actions were taken in retaliation for his opposition to what he believed to be discriminatory acts: (1) he was given a poor teaching evaluation after his reappointment was denied; (2) he was excluded from participating in various meetings which he had previously attended; and (3) he was subjected to increased scrutiny of his laboratory and its equipment.

5. The plaintiff has failed to sustain his burden of proving that any of these actions were taken as a result of his opposition to what he believed was discrimination. The defendant has articulated a legitimate non-discriminatory reason for each alleged retaliatory act, and the plaintiff has failed to demonstrate that these proffered reasons are merely a pretext for retaliation.

6. The plaintiff has failed to demonstrate that the 1988–89 teaching evaluation of him conducted by Prof. Levine was done in retaliation for the plaintiff's protected activity. When Prof. Levine had reviewed Dr. Spencer's teaching in November 1985, Prof. Levine reported that Dr. Spencer had a belligerent attitude towards his students and that his teaching was adequate but could be improved. The poor 1988–89 evaluation of Dr. Spencer's teaching was in keeping with Prof. Levine's earlier evaluation. In addition, Profs. Chencinski, Levine, and Weiszmann all testified that they had received informal complaints from students about Dr. Spencer's teaching. Furthermore, even if Prof. Levine's 1988–89 evaluation of Dr. Spencer was out of line with previous evaluations of Dr. Spencer's teaching, which it was not, Dr. Spencer failed to show that there was any sort of causal connection between his protected activity and this poor evaluation. At trial Dr. Spencer suggested that this evaluation was completed simply to harass him, given that he already had been denied reappointment. The university rules belie this argument, however, because they provide for an annual review of a professor's teaching performance regardless of whether he is reappointed or not.

7. The plaintiff has also failed to show that his exclusion from some departmental meetings was retaliatory conduct. His exclusion was consistent with the Bylaws of the Trustees of COSI. He was excluded only from meetings concerning the future of the Department, which was understandable given the fact that he was not reappointed and did not have a stake in the future of the Department. Moreover, the plaintiff failed to prove that these actions were even adverse decisions. Other professors in the Department also were not invited to these meetings, and there was no evidence that attendance at such meetings was a benefit of employment. At the time Dr. Spencer was not invited to some Department meetings, it had already been determined that Dr. Spencer would not be reappointed for the following academic year, and thus it made perfect sense not to include him in long-term planning activities.

8. Finally, Dr. Spencer has failed to prove that the increased scrutiny of his laboratory and its equipment was a retaliatory act. The credible testimony was that it was necessary to keep an inventory of the equipment in Dr. Spencer's laboratory in order to know how this equipment could best be used elsewhere at COSI after Dr. Spencer departed.

### CONCLUSION

For all of the foregoing reasons, the defendant's motion for judgment at the close of all the evidence is GRANTED, and judgment is

ordered to be entered for the defendant dismissing the plaintiff's complaint with prejudice.

**SO ORDERED.**