**Terry PAYTON, Plaintiff,**

v.

**CITY UNIVERSITY OF NEW YORK, Defendant.**

**No. 03 Civ. 8536(RWS).**

United States District Court, S.D. New York.

Sept. 28, 2006.

---

Zabell & Associates, by Elizabeth Urena, Esq., of Counsel, Bohemia, NY, Attorneys for Plaintiff.

Michael A. Cardozo, Corporation Counsel of the City of New York, by Shivani Soni, Esq., Assistant Corporation Counsel, of Counsel, New York, NY, Attorneys for Defendant.

## OPINION

SWEET, District Judge.

Defendant City University of New York ("CUNY") has moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P., to dismiss the complaint of the plaintiff Terry Payton ("Payton" or the "Plaintiff") alleging discriminatory discharge from his position as a probationary Campus Peace Officer and retaliation. Payton has moved for a continuance and additional discovery pursuant to Rule 56(f), Fed.R.Civ.P. For the reasons set forth below, the motion of CUNY for summary judgment is granted, and the motion of Payton for a continuance is denied.

### Prior Proceedings

Payton filed his complaint on October 29, 2003, alleging that he is African–American and that CUNY discrimated against him by terminating him on the basis of his race from his position as a probationary Campus Peace Officer at the Bronx Community College ("BCC") in violation of Title VII, 42 U.S.C. § 2000–e, et seq. Payton also alleged that CUNY retaliated against him after he complained of "racial profiling."

Discovery proceeded and by order of March 24, 2005 the date for completion of discovery was May 5, 2005. Thereafter, CUNY moved for summary judgment, Payton moved for a continuance, and both motions were marked fully submitted on April 7, 2006.

### The Facts

The facts are set forth in CUNY's Statement of Undisputed Facts pursuant to Local Rule 56.1, Payton's 56.1 Counter Statement of Material Facts, and CUNY's Response to Plaintiff's Counter–Statement. The facts are not in material dispute except as noted below.

CUNY is a separate body corporate which governs and administers the various senior and community colleges which comprise CUNY. See N.Y. Educ. Law § 6200 et seq. BCC is one of the community colleges operated by CUNY, and it is authorized to hire campus peace officers. See N.Y. Educ. Law § 6200 et seq.

Shelley B. Levy ("Levy") is Director of Human Resources at BCC and is responsible for, inter alia, overseeing the Department of Human Resources at BCC, and effectuating the hiring and termination of civil service employees, including Campus Peace Officers.

Mary E. Coleman ("Coleman") is the Vice President of Administration and Finance for BCC and makes the ultimate decision regarding the hiring and termination of Campus Peace Officers. According to Payton, Levy is responsible for hiring Campus Peace Officers.

Steven Heubeck ("Heubeck") is the training Director for CUNY, Department of Public Safety, and is responsible for overseeing the training of new recruits for Campus Peace Officer and the continuing training of other public safety personnel at CUNY. Heubeck has no authority to hire, promote, give a pay raise, or terminate any Campus Peace Officer. According to Payton, he supervised Payton, reviewed and praised his performance.

McThadeus Holden ("Holden") is the Director of the Public Safety Department at BCC. He is responsible for, inter alia, supervising all Campus Peace Officers at BCC and ensuring compliance with the rules of conduct as set forth in the Operations Guide for all Uniformed Personnel for CUNY's Campus Public Safety Officers. The Operations Guide for all Uniformed Personnel for CUNY's Campus Public Safety Officers, including Campus Peace Officers, states:

C. Attendance and Punctuality.

1. Campus officers on duty shall not be absent from duty without official leave; such leave shall be approved in compliance with F.L.S.A. standards, University Personnel Rules, Regulations, and Policies and such additional college policies as may be in force.

2. Campus officers shall be punctual in reporting for duty and in maintaining assigned work schedules, complying with University Personnel Rules, Regulations and Policies and such additional college policies as may be in force.

The CUNY Civil Service Employee Handbook provides that it is an unacceptable activity to be "absent without authorized leave (AWOL)," and provides, in part, that:

> ... Employees who take time off without prior notification and approval are considered to be Away Without Leave (AWOL) and subject to disciplinary procedures.
>
> 4. Please note that you are paid for approved time off *only* if you have enough accrued annual leave to cover your absence. If not, you may request a leave *without pay*, subject to approval by your Department Head and the Department of Human Resources.

In February 2002, Payton took and passed CUNY civil service examination number 1054 for Campus Peace Officer and by letter dated September 30, 2002, Levy offered Payton employment with BCC as a probation Campus Peace Officer, Level I, with a date of appointment of November 18, 2002. The September 30 letter stated, among other things:

> This job offer is contingent upon the satisfactory completion of ... mandatory training....

Campus Peace Officers are required to attend and complete six and a half weeks of mandatory training, consisting of affirmative action training, arrest and apprehension training, documentation training, and legal instruction.

Because Payton's date of appointment was November 18, 2002, he was required to attend and satisfactorily complete training from November 18, 2002 to January 16, 2003.[1] Beginning on November 18, 2002, training for Campus Peace Officers hired from CUNY civil service examination number 1054 occurred in two locations. For the first five weeks, training took place at John Jay College and then the last two weeks of training from January 2, 2003 through January 16, 2003 was held at Lehman College located in the Bronx, New York.

The November 2002 training group was divided into two squads, Squad "A" and Squad "B." Squad A was led by Dwayne Abernathy ("Abernathy"), a black male, and Squad B was led by Coraly Antigue ("Antigue"), a Hispanic woman.

The class roster indicates that of the 17 people in Squad A, seven were black and of the 16 people in Squad B, nine were black. Payton has challenged the roster and the descriptions of the probationary Campus Peace Officers but has submitted no evidence to support his challenge.

For Campus Peace Officers at CUNY there are three separate uniform requirements. The first uniform is a training class room uniform, the second is a training gym uniform, and the third is a uniform required for graduation and patrol duties on campus ("graduation and patrol duty uniform").

---

1. The recruits did not attend training for the period December 24, 2002 through January 1, 2003.

Payton was informed at a hiring pool for Campus Peace Officers that he must have the complete graduation and patrol duty uniform at the time of graduation and that he is required to pay a deposit of $250.00 for such a uniform at the time of measurement and purchase, which he assented to in writing. According to Payton, he was told BCC would provide financial assistance for a uniform costing $1,500.00.

When Payton was offered employment by BCC by letter dated September 30, 2002, he was directed to appear for measurement and purchase of the graduation and patrol duty uniform on Monday, November 18, 2002. This letter also notified Payton that:

> All officers must be in full [graduation and patrol duty] uniform attire at graduation exercises. Uniform vendors will require a deposit of $250.00 payable by cash. The balance will be due upon receipt of the uniform.

In or about October 2002, during orientation, Payton was measured for a graduation and patrol duty uniform. At that time Payton did not pay the $250.00 deposit to the vendor for a graduation and patrol duty uniform as required.

As training progressed, Payton had not yet purchased outright a graduation and patrol duty uniform nor requested an advance to purchase such a uniform as he never contacted BCC's Department of Public Safety or the Accounting Department to utilize the assistance procedure provided by BCC. According to Payton, he sought assistance from Heubeck, Stan Grubman, John McKee, Levy, Sergeant Gore, and Corporal Velasquez.

Trainees were not required to purchase the training class uniform or the training gym uniform, trainees were only required to purchase the graduation and patrol duty uniform. According to Payton, trainees were required to purchase pants and shirts. CUNY provided two CUNY t-shirts and two blue t-shirts. Although recruits could wear plain navy blue t-shirts and sweatshirts during classroom and gym training, they were not allowed to wear clothing with logos on it.

According to CUNY, during the period that Payton was in classroom and gym training, he disregarded the instructions from his supervisors and wore clothing with logos on it. However, he was never disciplined or reprimanded for not having a proper training classroom or gym uniform. Payton has denied this statement but the issue is not material.

The graduation and patrol duty uniform consists of an eight point hat, navy tunic, patrol navy shirt, a black or blue clip-on tie, navy pants, black patrol belt, law enforcement boots or shoes, and white gloves.

Each recruit was required to purchase the graduation and patrol duty uniform at any time from F & J Police Equipment, Inc., the outside vendor used by CUNY to supply Campus Peace Officers with such a uniform. Payton was advised that BCC provided assistance for the purchase of uniforms. Payton signed a form indicating his assent to the uniform purchase requirement.

The recruit could request the assistance of BCC in purchasing the uniform. Nine other newly hired Campus Peace Officers assigned to BCC, of which three were black, three Hispanic, one Puerto Rican, and two white employees, requested and obtained assistance to procure a graduation and patrol duty uniform. BCC provides assistance to new recruits in purchasing a uniform by deducting a certain amount from the recruit's paycheck for approximately ten pay checks, and sending this amount directly to the vendor, F & J Police Equipment, Inc. In order to obtain

this assistance, a recruit must contact the Department of Public Safety and the Accounting Department at BCC, which are responsible for providing assistance in securing a uniform.

According to CUNY, Sergeant Gore, who is another BCC Campus Peace Officer, is not authorized to process requests for assistance to obtain uniforms and is not a proper party to contact regarding a request for assistance to obtain a graduation and patrol duty uniform. According to Payton, Gore accepted a receipt from Payton and said he would submit it to the accounts payable office.

All Campus Peace Officers are required to be properly uniformed at graduation from the CUNY training academy. All recruits indicated their assent thereto by signing a Statement of Understanding.

Payton understood his responsibilities for securing a uniform which costs approximately $1,500.00 and similarly gave his assent thereto by also signing the Statement of Understanding. According to Payton, BCC provided financial assistance for the purchase of a uniform.

In or about late November 2002, Payton complained of racial profiling and student friction in his training class to Deputy Director John McKee ("McKee"), the immediate supervisor of Heubeck, and to Lieutenant Darryl Carabello ("Carabello").

Thereafter, McKee and Carabello addressed Payton's concerns by speaking to his training class. After the discussion with the training class, the students' relationship with one another improved and friction ceased.

After Payton complained of racial profiling to McKee and Carabello, his training supervisors, including Heubeck, determined that Payton successfully passed the academic and physical components of training. All of the trainees in Payton's class who completed training, including African–Americans, passed and were assigned to their respective colleges.

During training, Heubeck told recruits in Squad A and B, including Payton, not to appear at John Jay College for training from December 24, 2002 through January 1, 2003, and that instead they were to report to the colleges to which they were assigned and on January 2, 2003 to report to Lehman College to continue the remainder of training. According to Payton, he was told that he could not report without a uniform and equipment.

Because Payton was assigned to BCC, he was told to report to BCC for the period December 24, 2002 through January 1, 2003.

Payton did not report to work at BCC from Tuesday, December 24, 2002 through Wednesday, January 1, 2003. According to Payton, he called Ms. Belkis Soler ("Soler")[2] on December 24, 26, and 27 and left messages for Vickie Shankman ("Shankman"), Levy and the Department of Public Safety. During the period from December 24, 2002 through January 1, 2003, Payton called the following phone numbers associated with BCC on the following days and times: (1)(718) 289–5119 on December 24, 2002 at 12:20 p.m.; (2)(718) 289–5789 on December 24, 2002 at 12:21 p.m.; and (3)(718) 289–5119 on December 27, 2002 at 4:02 p.m. None of these phone numbers are the numbers to the Department of Safety at BCC. According to Payton, he was transferred by Belkis to various offices where he left messages. During these telephone calls, Payton did not speak to Holden or to anyone in the Department

---

**2.** At various times Payton referred to this person as Ms. Balkis, counsel has referred to Belkis Soler. The confusion over her name does not constitute a material dispute of fact.

of Public Safety, Accounts Payable Department, or to Levy.

Payton did not indicate in writing to anyone at CUNY or BCC that he would not appear at work for the period December 24, 2002 through January 1, 2003. Payton did not request in writing to be excused from appearing for work for the period December 24, 2002 through January 1, 2003, nor to be provided leave for the period December 24, 2002 through January 1, 2003.

On January 2, 2003, Holden issued a memo to Vice President Coleman ("Coleman") requesting that Payton be terminated from his probationary position for being AWOL. The January 2, 2003 memo of Holden stated:

1. Patrol Officer Payton was appointed on November 15, 2002 and assigned to the University training program at John Jay College on November 18, 2002 to last until January 16, 2003.

2. All trainees were advised by the University Director of Training, Steven Heubeck, that during the holiday no classes would be held from December 24, 2002 to January 1, 2003 and all trainees should report to their respective colleges on December 24 and report back for training at Lehman College on January 2, 2003[.] Officer Payton failed to appear at Bronx Community College at any time from December 24, 2002 to January 1, 2003.

3. The college was advised that the officer reported back to training on January 2, 2003.

By letter dated January 3, 2003, Payton was advised by Levy that he was terminated. The letter states:

Please be advised that you did not successfully complete the mandatory Campus Peace Officer Training Program which you have been attending since November 18, 2002. Therefore, you are hereby terminated from this position effective close of business Friday, January 3, 2003.

Please return your College I.D. card to Mr. Mac Holden, Director of Public Safety, prior to your leaving the campus. You may leave a self addressed stamped envelope in the Bursar's Office for any pay due you.

Payton did not report to work for the period December 24, 2002 through January 1, 2003 and did not have accrued time or prior authorization for this absence. His explanation for his absence was that he had been told a uniform was required and he did not have a uniform.

Heubeck had no input into the decision to terminate Payton, and Heubeck did not at any point recommend that Payton be removed from training.

Since the summer of 2002, other than Payton, no recruits of any nationality or race, including African–American, have been AWOL nor has any other recruit been terminated during the course of training.

According to CUNY, in order for Payton to work at BCC from December 24, 2002 through January 1, 2003, he did not need a graduation and patrol duty uniform because he had not yet graduated. According to Payton, he was told he needed a uniform.

The collective bargaining agreement that governs Campus Peace Officers states in pertinent part:

Any employee who has completed four (4) months of service may be permitted to take approved leave as it accrues.

Because Payton was appointed on or about November 18, 2002, and was terminated on January 3, 2003, Payton had been employed for less than four months.

### Standard For Summary Judgment

In deciding a motion for summary judgment, a court shall render judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000).

The moving party has the initial burden of showing that there are no material facts in dispute, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and can discharge this burden by demonstrating that there is an absence of evidence to support the non-moving party's case, *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party then must come forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), as to every element "essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

The Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1187 (2d Cir.1987); *Eastway Constr. Corp. v. New York*, 762 F.2d 243, 249 (2d Cir. 1985). However, the Court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If there is not, summary judgment is proper. *Id.* at 249–50, 106 S.Ct. 2505.

### A Prima Facie Case Of Discrimination Has Not Been Established

Whatever the confusion between Payton and CUNY over uniform requirements, Payton has failed to establish sufficient facts to make a discrimination case.

■ In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court first articulated the three-step burden shifting analysis which courts must apply when analyzing a Title VII case alleging the defendant wrongfully terminated plaintiff. Under the *McDonnell Douglas* analysis, the plaintiff bears the burden of proving a *prima facie* case of discrimination. To establish a *prima facie* case of discrimination based on race, a plaintiff must show (1) membership in a protected class, (2) qualification for the employment, (3) an adverse employment decision, and (4) circumstances that give rise to an inference of discrimination. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *see also Spencer v. City Univ. of New York*, 932 F.Supp. 540, 546 (S.D.N.Y.1996). Here, CUNY has conceded for purposes of this motion that Payton can establish the first, second, and third prongs of a *prima facie* case. However, he has failed to establish that he was terminated under circumstances that give rise to an inference of unlawful race discrimination.

■ Payton has contended that he was terminated by Heubeck, who practiced "racial profiling" during the course of training conducted for new Campus Peace Officers.

However, it is undisputed that Heubeck had no authority to terminate Payton. That power was vested in Coleman, Vice President of Administration and Finance for BCC, and effectuated by Levy, Director of Human Resources at BCC. Payton has not produced any evidence that

Heubeck even influenced the decision-makers in CUNY to terminate him. In fact, Heubeck learned of the termination after the decision was made because he was directed to tell Payton that he must report to BCC on January 6, 2003. A conclusory allegation by Payton based on his subjective belief does not create a genuine issue of fact of discriminatory animus to defeat a motion for summary judgment. *See Khan v. Abercrombie & Fitch, Inc.*, 2003 WL 22149527, 2003 U.S. Dist. LEXIS 16329, at *19 (S.D.N.Y. Sept. 17, 2003); *Coleman v. Bd. of Educ.*, 2002 WL 63555, 2002 U.S. Dist. LEXIS 619, at *23 (S.D.N.Y.2002), *aff'd*, 45 Fed. Appx. 78 (2d Cir.2002).

In addition, Heubeck evaluated Payton's performance and passed him in both the academic and physical components of training. It is also undisputed that whether or not Payton had the proper uniform for training, he was not reprimanded by Heubeck. The sixteen African–American recruits in Payton's class all satisfactorily passed training and graduated.

Payton has contended that there is a dispute of fact concerning his termination, asserting that other recruits were advised that they could not work on campus unless they had a uniform; that he made multiple attempts to purchase a uniform, which were ignored; and that he called BCC during the period he was AWOL and was ignored. (*See* Plaintiff's Memo of Law, pp. 12–23). Even accepting these allegations, they would not establish the existence, or even create an inference, of illegal bias, discrimination or retaliation.

Payton does not dispute that Heubeck passed him in training and that there were many other African–American recruits in his training class who passed training and graduated. Furthermore, none of the alleged words used by Heubeck, such as "moose," "weasel," or "dirty" carry with them any inherent racial overtones. Pay-

ton has not offered evidence that they expressed racial animus; even if they were inappropriate or intemperate, they do not give rise to an inference of discrimination. *See Hawkins*, No. 99 Civ. 11704, 2005 WL 1861855, 2005 U.S. Dist. LEXIS 15898, at *39–40 (S.D.N.Y. Aug. 4, 2005).

Payton has not offered any evidence or even made any allegations of animus on the part of the seven people, in addition to Heubeck, whom he claims he asked for assistance in obtaining a uniform. Moreover, nine other recruits in his training class, three of whom were African–American, were able to obtain such assistance.

Payton has not shown any circumstances that give rise to an inference of race discrimination.

█ No evidence has been presented that the work environment was "permeated with discriminatory intimidation, ridicule, and insult that was so severe or pervasive as to alter the conditions of his employment." *Id.* Moreover, Payton has not established that any of the alleged conduct occurred because of his race. *See Hawkins*, 2005 WL 1861855, 2005 U.S. Dist. LEXIS 15898, at *39–40. The names "moose" and "weasel" were not directed at Payton and do not have a racial connotation; therefore, they do not reflect racial animosity. The allegation that Heubeck threatened to shoot trainees and his comments of being "dirty" and having a weapon were directed broadly to the class and have no racial element. The request to see a photograph of the injury to his leg has not been shown to be racially motivated since at the time Payton was supposedly not able to take part in the running and physical fitness aspect of training, he was observed by Heubeck running from the college to public transportation. (Heubeck Tr. 50:20–5:17).

The alleged conduct in question was not "severe and pervasive," nor did it interfere with Payton's work performance, as he passed training. Conduct that is "merely offensive, unprofessional, or childish" cannot support a hostile work environment claim. *See Hawkins*, 2005 U.S. Dist. 15898, at *40. Nor can "offhand comments," "isolated incidents," "stray remarks," or Payton's subjective belief constitute a viable claim. *See id.* at 43; *Rivera v. Potter*, No. 03 Civ.1991, 2005 WL 236490, 2005 U.S. Dist. 1416–15 (S.D.N.Y. Jan. 31, 2005). Title VII is an anti-discrimination statute, not a "general civility code." *See Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir.2004) citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Payton has failed to establish a *prima facie* case of discrimination.

### A Prima Facie Case Of Retaliation Has Not Been Established

Retaliation claims asserted under Title VII are also governed by the burden-shifting analysis set forth in *McDonnell Douglas Corp.*, 411 U.S. at 802–04, 93 S.Ct. 1817; *Raniola v. Bratton*, 243 F.3d 610, 624 (2d Cir.2001). To establish a *prima facie* case of retaliation under Title VII, plaintiff must show: (1) participation in a protected activity known to the defendant; (2) the employer was aware of the plaintiff's participation in the protected activity; (3) an employment action disadvantaging plaintiff; and (4) a causal connection between the protected activity and the adverse employment action. *See Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001); *McMenemy v. City of Rochester*, 241 F.3d 279, 282–83 (2d Cir.2001); *Holtz v. Rockefeller*, 258 F.3d 62, 79 (2d Cir. 2001); *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir.1996).

In order to establish a causal connection between a protected activity and retaliatory adverse employment action, a party may rely on direct evidence of retaliatory animus or solely on circumstantial evidence such as the timing of the alleged adverse action in relation to the protected activity. *Demoret v. Zegarelli*, 361 F.Supp.2d 193, 202–03 (S.D.N.Y.2005).

Here Payton has claimed that CUNY retaliated against him by terminating him after he complained about racial profiling. (*See* Compl. ¶¶ 22, 40). In fact, Payton made a one-time verbal complaint to McKee and to Carabello during the course of training at John Jay College. Levy is the Director of Human Resources in charge of effectuating terminations; Coleman is the Vice President of Administration and Finance and made the ultimate decision regarding terminations; and Holden is the Director of Public Safety responsible for supervising all Campus Peace Officers. Payton has presented no evidence to show that Levy, Holden or Coleman were aware that Payton made a verbal complaint of racial profiling and student friction to McKee· or Carabello. Payton has not established the required causal nexus between his complaint and the decision to terminate him. *See Greaves v. St. Luke's Roosevelt Hospital Center*, 2005 WL 627635, 2005 U.S. Dist. LEXIS 4082 (S.D.N.Y.2005) (plaintiff did not show that the supervisors to whom he complained were involved in the decision to terminate him); *King v. Bratton*, 2004 WL 3090605, 2005 U.S. Dist. LEXIS 26011, at *33 (E.D.N.Y.2004) (plaintiff had no credible evidence suggesting that those in charge of his termination were even aware of plaintiff's complaints); *Mendoza v. SSC&B Lintas, New York*, 125 F.3d 844, 1997 U.S.App. LEXIS 27259 (2d Cir.1997) (affirming district court's conclusion that plaintiff's termination was not discrimina-

tory because the decision-makers were unaware of plaintiff's complaint), *cert. denied,* 523 U.S. 1099, 118 S.Ct. 1566, 140 L.Ed.2d 800 (1998).

In addition, after Payton complained of racial profiling, his performance during training was graded by his training supervisors, and he passed both the academic and the physical components to training. This approval makes it improbable that CUNY would expend efforts to train Payton if it had the intent to ultimately retaliate against him for complaining. *Simmons v. New York City Police Dep't.,* 2004 WL 1724982, 2004 U.S. Dist. LEXIS 14821 (S.D.N.Y.2004).

In the absence of any causal connection between the complaints and the termination, no *prima facie* case of retaliation has been established.

### The Facts Relating To Termination Are In Dispute

It is the position of CUNY that the termination of Payton was for a legitimate, non-discriminatory reason, namely that Payton failed to report for duty at the campus as directed. According to Payton, he was instructed to report in uniform, he advised BCC orally that he did not have a uniform and requested the assistance in obtaining the uniform which he believed he appropriately sought. According to CUNY, there was no uniform requirement since the training course had not been completed and no written request was made or permission granted to release Payton from the conceded direction to report on December 24, 2002.

A hearsay version of these events is contained in the submission of CUNY counsel to the EEOC submitted as Exhibit K to the affidavit in support of the motion. It stated that Payton was instructed by a Security Specialist in charge of training to purchase a uniform before reporting and told him how to receive financial assis-tance, that he did not report or seek the assistance and that the reason stated in the January 3 letter terminating Payton was in error. The exhibit described the termination process as follows:

As I have previously stated to you, there was an error in the termination letter dated January 3, 2003. For this reason, in order to resolve the complaint through your office, the College had offered Mr. Payton the opportunity to join the next training class. You informed me on April 7, 2003, that Mr. Payton was not interested in joining the next class, which will now begin in several weeks.

The January 3, 2003 termination letter incorrectly gave the reason for termination as failure to successfully complete the Campus Peace Officer Training Program. The error occurred because the College's Director of Human Resources, Shelley Levy, consulted with the University's Director of Human Resources, Arthur Brown, in accordance with CUNY Personnel Policy Bulletin No. 23–02, which requires such consultation where a termination is to occur within eight weeks of the original appointment, as was the case here. Mr. Brown was new to the University having just assumed his position in May 2002. The result of their consultation was that Ms. Levy and Mr. Brown believed the holiday work period at the college was part of the training program, and therefore the college could terminate Mr. Payton for failure to complete the training program under Personnel Policy Bulletin No. 23–02, a copy of which is enclosed. Otherwise, under Personnel Policy Bulletin No. 23–02, the termination would have had to been communicated in writing to the University Human Resources Director and approved by him.

Whether Payton sought to avoid reporting over the holiday period as CUNY would imply, or sought inadequately to comply with instructions as Payton has suggested, is a matter of factual dispute. It does appear that the initial reason given for the termination was not correct, particularly since the training program had not concluded. Notwithstanding this error, it also appears that Payton did make some effort to explain his inability to comply with the instructions he had been given.

Whatever the mistake, either on CUNY's part or Payton's, the facts are in dispute. Notwithstanding, there is no evidence that there was a discriminatory or retaliatory motive in the termination.

### The Request For A Continuance Is Denied

■ Discovery was completed on May 5, 2005. Additional discovery responses were supplied by CUNY on August 25. Certain of these were submitted on August 26 as exhibits in support of the motion. Payton now seeks a continuance to obtain discovery relating to the BCC 2004 telephone directory as well as to obtain certain discovery which was requested during the discovery period but not made the subject of any application of the court. Discovery is also sought with respect to a request made by CUNY for a New York State Department of Labor hearing involving Payton's receipt of unemployment insurance.

According to CUNY, the telephone directory is publicly available (Griffith Affid. ¶ 32) and was never previously requested. No material fact has been identified as being derived from the directory.

Discovery surrounding "plaintiff's misconduct as referenced by Defendant in their August 29, 2005 letter to the New York State Department of Labor" would not create an issue of material fact. CUNY's letter to the New York State Department of Labor was not disclosed by CUNY to Payton, was dated August 29, 2005, three days after CUNY served and filed its summary judgment motion on August 26, 2005.

Payton may seek to distinguish between CUNY's proffered reason for his termination and CUNY's statement in the letter to the Department of Labor that he was terminated for misconduct. Payton's failure to comply with time and leave procedures may constitute misconduct. *See Turner v. Simpson*, 60 N.Y.2d 959, 961, 471 N.Y.S.2d 56, 459 N.E.2d 165 (1983). In any case, Labor Law § 623(2) provides that unemployment proceedings have no preclusive effect on court proceedings. Labor Law § 623; *Wooten v. New York City Dep't of Gen. Servs.*, 207 A.D.2d 754, 617 N.Y.S.2d 3 (1994). Accordingly, Payton has failed to demonstrate how discovery surrounding CUNY's response to New York State Department of Labor would create an issue of material fact.

■ In view of the preceding conclusions concerning the lack of evidence of discrimination and retaliation, there has been no showing of a need for further discovery meeting the requirements of Rule 56(f). *See Burlington Coat Factory Warehouse v. Esprit De Corp.*, 769 F.2d 919, 926 (2d Cir.1985); *King v. D.O.C.*, 1998 WL 67669, 1998 U.S. Dist. LEXIS 1825, at *19–20 (S.D.N.Y.1998) citing *Paddington v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir.1994) (same). Moreover, a Rule 56(f) request can still be rejected if it is "based on speculation as to what potentially could be discovered." *See Paddington v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994). As Payton has failed to meet the requirements of these authorities, his 56(f) motion is denied.

### Conclusion

For the reasons set forth above, the motion of CUNY for summary judgment

dismissing the complaint with prejudice is granted.

Submit judgment on notice.

It is so ordered.